Submitted October 2, reversed and remanded November 27, 2013

In the Matter of M. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

D. J.,
*Appellant.*

Linn County Circuit Court
J110546;
Petition Number 11213J;
A154071

314 P3d 998

Peter Gartlan, Chief Defender, and Valerie Colas, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Hadlock, Judge, and Edmonds, Senior Judge.

HADLOCK, J.

**HADLOCK, J.**

In this juvenile dependency proceeding, father appeals a judgment that changed the permanency plan for his daughter, M, from reunification to adoption.[1] Father, who was incarcerated at the time of the permanency hearing, was represented by counsel at the hearing but wished to participate personally and testify by telephone. Father contends that the juvenile court erred in proceeding with the permanency hearing after attempts to call him at the prison failed. We agree and, therefore, reverse.

The facts are not in dispute. In December 2011, father and mother had a violent altercation in M's presence. M was six years old at the time. The police responded to the altercation and found methamphetamine-related paraphernalia at the scene. Both parents were arrested and later charged with possession of methamphetamine, endangering the welfare of a minor, and fourth-degree assault; in addition, father was charged with strangulation. On the day of parents' arrest, the police contacted the Department of Human Services (DHS), which took protective custody of M, placed her with her maternal grandmother, and later arranged for her to receive regular counseling. M subsequently tested positive for methamphetamine. In February 2012, the juvenile court asserted jurisdiction over M.

DHS offered father services aimed at enabling him to resume custody of M, including batterers' intervention, drug and alcohol evaluation, supervised visitation with M, and parenting classes. Father began participating in batterers' intervention services. He also completed a drug and alcohol evaluation, and the evaluator recommended that father engage in treatment because he was using prescription opiates. Father did not comply with that recommendation; at the time, he evidently indicated that he did not want to participate in treatment because he was suffering pain.

In June 2012, father was arrested for several probation violations, and his probation was revoked. He was incarcerated as a result, with an expected release date in

---

[1] Mother supports the change in the permanency plan and is not a party to this appeal.

early August 2013. Drug and alcohol treatment and batterers' intervention services were not available to father in prison, but he did participate in other programs, the nature of which the record does not reveal. Father told M's DHS caseworker, Dusseau, that he wanted to receive drug and alcohol treatment and resume batterers' intervention services when he was released. He also said that he planned to move into an addiction-recovery community home like an "Oxford House."

The permanency hearing was held in March 2013. At issue were whether the juvenile court should change the permanency plan from reunification and, if so, whether to change it to adoption or guardianship. As the hearing was set to begin, the court attempted to call the prison where father was housed so that father could participate in the hearing telephonically, but the prison telephone was busy. After a second unsuccessful attempt, the court announced that the hearing would proceed. Father's counsel objected to proceeding in father's absence, explaining that father wanted to be present, but the court overruled that objection.

In her opening statement, father's counsel told the court in general terms about father's participation in services in prison and his plans following his release:

"Your Honor, [father] is in prison and his anticipated release date is approximately August 2nd or 3rd of 2013. There may be some—we might not have any evidence, actually, upon—not having [father] on the phone. There are some reports indicating that [father] maybe hasn't made the best use of his time in prison, however, in speaking to him and talking to him about his programming he reports to me that he's been participating in programming, has made progress in services while in prison, and has been put on the waiting list for a parenting class. I believe that the dispositional order requires him to participate in a domestic violence intervention program. If he were here today to testify by phone he would tell the Court that upon his release he—and he has already, and I don't think this is contested, made numerous contacts with the agency, DHS, to ensure that he transitions into [a batterers' intervention program] immediately upon his release. He is prepared to do that. He will be on post-prison supervision when he gets out so in terms of any kind of issue pertaining to alleged

drug and alcohol problems will be addressed through his post-prison supervision. He has a clean and sober place to live."

In addition, father's attorney asserted that father opposed changing the permanency plan but—if the court did change it—would prefer a plan of guardianship to a plan of adoption.

In the evidentiary phase of the hearing, Dusseau, the DHS caseworker, testified that drug and alcohol treatment and batterers' intervention services were the only services that father would need to complete so M could return to his care. She added that the batterers' intervention was the "biggest concern" and that father would need to make "significant progress" with that for six months following his release. On cross-examination, Dusseau agreed that it would be possible for father to "transition right into the program" upon his release and that it was possible that he could make sufficient progress that M could be returned to his care in less than six months. She explained that, under the circumstances, father would have to be "well established in that program and making documented progress in order to consider returning [M] to his care sooner than that." Dusseau also stated that DHS would "feel comfortable" returning M to father's care in an Oxford House-type home.

DHS also presented testimony from M's maternal grandmother and from her counselor. The counselor testified that M needed "a safe, predictable, nurturing environment with a caretaker who puts her mental, emotional, and social needs first," and he opined that adoption was the best option for her.

Father's sole witness was his own mother, who testified only about the ability of various family members to maintain contact with M.

At the end of the hearing, the juvenile court found that it was not possible for M to be returned to the custody of either parent within a reasonable time. Specifically, with respect to father, it found that father "would not be in a position to have custody of [M] before early 2014 at the earliest," which, it explained, "would not be a reasonable amount of time." The court went on to conclude that the permanency plan should be changed to adoption. Accordingly, it entered a

judgment changing the permanency plan and ordering DHS to file petitions to terminate mother's and father's parental rights.

On appeal, father first argues that the juvenile court erred in holding the permanency hearing in his absence. He relies on ORS 419B.875(2), which provides, in part:

"The rights of the parties include, but are not limited to:

"* * * * *

"(c) The right to call witnesses, cross-examine witnesses and participate in hearings[.]"

Father contends that the right to participate in hearings includes the right to testify about the issues before the court. In his view, the trial court denied him a fundamentally fair proceeding when it decided to proceed in his absence, depriving him of that right to testify.

DHS responds, first, that father's argument is not preserved for appeal. We reject that argument without discussion. Second, DHS argues that, because ORS 419B.875(2) does not specifically mention the right to testify or the right to be present, a parent does not have those rights at a permanency hearing.[2] DHS contends that father did, in fact, participate in the hearing, through counsel, who told the court about father's involvement in programming in prison and explained father's position. According to DHS, there is no basis for suggesting that father's participation in the hearing would have been more effective had he been present by telephone.

Neither we nor the Supreme Court has ever construed the right to "participate in hearings," as that term is used in ORS 419B.875(2)(c). We readily conclude, however, that a party's right to participate includes the right to testify in the party's own behalf. That conclusion is inescapable given the other rights listed in subsection (2) of the statute. Those rights include—independent from the

_____

[2] ORS 419B.875 expressly applies to jurisdictional hearings under ORS 419B.100 and termination hearings under ORS 419B.500. DHS does not contend that the rights enumerated in ORS 419B.875(2) do not also apply to permanency hearings. Accordingly, we assume, without deciding, that those rights do apply in this case.

right to "participate"—the "right to appear with counsel." ORS 419B.875(2)(b). If appearing with (or through) counsel counted as "participat[ing] in hearings," as DHS argues, then subsection (2)(c) of the statute would be superfluous. We construe statutes "so as to give effect to all relevant provisions" and not in a way that would render some provisions "surplusage." *State v. Mayes*, 220 Or App 385, 389, 186 P3d 293 (2008). Moreover, in addition to granting the right to "participate," subsection (2)(c) also affords the right to call witnesses. The provision cannot plausibly be understood to allow a party to *call* witnesses but not to *be* a witness. Participating in a hearing solely through counsel cannot substitute for participating as a witness if a party wishes to offer his or her own testimony, which father did in this case. Accordingly, we agree with father that the juvenile court erred in proceeding with the hearing in his absence.[3]

We turn to the question of whether the court's error was prejudicial. *See Cler v. Providence Health System-Oregon*, 349 Or 481, 490, 245 P3d 642 (2010) (we will reverse a judgment based on a lower court's error only if that error substantially affected a party's rights). In that regard, DHS contends that there is no reason to believe that father's personal participation would have been more effective than his participation through counsel. In support of that argument, DHS quotes the opening statement made by father's attorney, in which the attorney described, in general terms, what father would have said had he been able to testify. We understand DHS's argument to be that those statements by father's attorney adequately substituted for the evidence that father would have given had he been able to personally participate in the hearing. For at least three reasons, we disagree.

First, the attorney's factual assertions about father's participation in services (both accomplished and planned)—whether they are considered as part of the attorney's opening statement or as part of an offer of proof—are not themselves evidence. Moreover, nothing in the record suggests that the juvenile court gave those assertions evidentiary weight.

---

[3] DHS has not argued that father waived his right to participate in the hearing; consequently, we need not address what conduct by a parent might amount to a waiver of that right.

Second, even if we assumed that the juvenile court gave substantive weight to the attorney's statements, those general assertions about father's participation in programming could not substitute for the more detailed testimony that father presumably would have been able to give, and that DHS would have been able to test on cross-examination. Such details could have been significant in light of DHS caseworker Dusseau's testimony that whether M could be returned to father's care in less than six months following his release would depend on how father did in the batterers' intervention program and whether he was making documented progress. If father had been given an opportunity to discuss his participation in prison programs and to convince the court that he was dedicated to actively participating in other programs, including batterers' intervention, after his release, he might have been able to persuade the court that he could be reunited with M within a reasonable time. Thus, father's testimony could have influenced the court's finding as to when he might be able to resume custody of M and, in turn, its conclusion as to whether any compelling reason existed for DHS not to promptly file a termination petition. See ORS 419B.498(2)(b)(A) (a compelling reason for concluding that filing a termination petition would not be in a child's best interests includes a determination that the parent "is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time").

Finally, in the context of a permanency hearing—particularly one in which a parent hopes to convince a court to adopt guardianship as the plan, rather than adoption, if it changes the plan at all—it is critical for the court to hear the parent's personal account of his or her participation in services, plans for the future, and reasons for desiring a plan that will allow the parent to maintain contact with the child. Counsel's representations about what testimony the parent would have given are no substitute for the court hearing the parent's own plea to be allowed to maintain some sort of relationship with his or her child. The parent's demeanor, credibility, and persuasiveness in delivering that plea (whether observed visually or, as would have been the case here, through hearing the parent's speech patterns, tone, and pitch of voice) may be critical to the court's ultimate determination.

We recognize that the record does not demonstrate unequivocally that father's testimony would have influenced the juvenile court's decision regarding the appropriate permanency plan for this child. Ordinarily, we will not reverse a trial court's judgment based on the possibility that excluded evidence might have affected the outcome of the proceeding unless the appellant made an offer of proof showing that the exclusion of the evidence was prejudicial. *See* OEC 103(1)(b) (evidentiary error is not presumed to be prejudicial, and error may not be predicated on the exclusion of evidence unless a substantial right of a party is affected and the substance of the excluded evidence was made known to the court). But this case does not involve ordinary evidentiary error. As explained above, father was not simply denied the ability to testify as to particular facts; he was denied the opportunity to speak directly to the juvenile court at a time when the court had to determine whether it believed that father's progress in services meant that a petition to terminate his parental rights should not be filed, either because the possibility of reunification within a reasonable time presented a compelling reason for DHS not to file such a petition, or because a permanency plan other than adoption would be more appropriate. Under those circumstances, the assertion by father's attorney that father wished to participate at the permanency hearing was adequate to establish that he was prejudiced by the denial of that right. And in the circumstances of this case, that offer of proof was sufficient even with respect to the facts to which father might have testified, given that his attorney had no way of knowing that father would not be present at the hearing and, therefore, no reason (or opportunity) to prepare a more detailed offer of proof about father's participation in prison services or his plans for pursuing services after his release.

In sum, we conclude that the trial court erred by proceeding with the permanency hearing in father's absence, over the objection by father's attorney, and that father was prejudiced by that error. The remedy for that error is reversal of the permanency judgment and remand.

In two other assignments of error, father challenges the trial court's determination that "there are no compelling reasons that would justify continuing the current plan of

reunification or otherwise not proving the plan of adoption" and its decision to change the permanency plan to adoption. Because the permanency judgment must be reversed because of the denial of father's right to participate in the permanency hearing, we do not reach those assignments of error.

Reversed and remanded.